RUCKER, Justice.
The Indiana Legislature has passed a law that requires a woman seeking an abortion to give her informed consent pri- or to the procedure and, except in the case of a medical emergency, specifies that a physician (or other medical personnel) must "orally" and in her presence provide her with certain information at least 18 hours before the abortion is performed. The plaintiffs in this case contend that this law on its face violates the right to "liberty" set forth in Article I, Section 1, of the Indiana Constitution. We hold that this law is not unconstitutional because the plaintiffs cannot demonstrate that there are no set of circumstances under which the statute can be constitutionally applied. We further hold that even if the law were challenged as unconstitutional as applied in a particular case, the challenge would fail because the law does not impose a material burden on any right to privacy or abortion that may be provided or protected by Article I, Section 1.
Background
In Roe v. Wade, the United States Supreme Court held that statutes enacted by the legislatures in Texas and Georgia violated an abortion right provided and protected by the United States Constitution. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 *976 (1973). In the intervening years, the scope of that right has been interpreted in many court decisions. One of those decisions held that the abortion right was not infringed upon by a statute enacted by the legislature in Pennsylvania that, among other things, (1) required that a woman seeking an abortion give her informed consent prior to the procedure and (2) specified that a physician "orally" provide her with certain information at least 24 hours before the abortion was performed. Planned Parenthood v. Casey, 505 U.S. 833, 881-87, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
A few years after Casey was decided, the Indiana Legislature enacted the statute at issue in this case. (A federal court would later note that the text of the Indiana statute "is materially identical to one held constitutional" in Casey. A Woman's Choice-East Side Women's Clinic v. Newman, 305 F.3d 684 (7th Cir. 2002).) The Indiana statute (1) provides that a woman seeking an abortion must give her informed consent prior to the procedure, and (2) specifies that a physician (or other medical personnel) must "orally" and in her presence provide her with certain information at least 18 hours before the abortion is performed. Ind. Code § 16-34-2-1.1.[1] It is often argued that one of the practical consequences of the requirement that the oral advisements be given to the woman in person 18 hours (or 24 as in Pennsylvania) before an abortion is performed is that the woman must make two trips to the facility. This has been referred to in subsequent litigation as the "in her presence" or "two trip" re *977 quirement. The "in her presence" or "two trip" requirement does not apply in the "case of medical necessity." Id.
In 1995, several health care facilities that provided abortion services and a physician who performed abortions filed suit in federal court contending that this Indiana statute violated the abortion right. recognized by Roe v. Wade. Ultimately, the federal courts held that the statute did not violate the United States Constitution. See A Woman's Choice, 305 F.3d at 693.
The plaintiffs in this case include some of the plaintiffs in the federal litigation just mentioned. They filed this lawsuit in 20083, shortly after the federal litigation came to an end, seeking a permanent injunction against the enforcement of the statute. They contend that although the federal courts have held that this statute does not violate the abortion right recognized by Roe v. Wade, it was nevertheless beyond the power of the Legislature to pass this statute because it violates provisions of the Indiana Constitution. Specifically, they first maintain that the statute violates Article I, Section 1,[2] of the Indiana Constitution because it "infringes upon women's liberty interests to determine the course of their medical treatment." Second, they maintain that the statute violates both Article I, Section 1, and Article I, Section 12,[3] because it "infringes upon women's right to choose abortion." Third, they maintain that the statute violates Article I, Section 9,[4] because it "infringes the rights of plaintiffs and their patients to the free interchange of thought and opinion and to freedom of speech." [5]
After considering the parties' arguments, the trial court dismissed the complaint without explanation. The Court of Appeals affirmed in part and reversed in part. Clinic for Women, Inc. v. Brizzi, 814 N.E.2d 1042 (Ind.Ct.App.2004). It rejected the plaintiffs' contention that the statute violates Article I, Section 9, and Article I, Section 12 of the Indiana Constitution. We summarily affirm those determinations. Ind. Appéllate Rule 58(A)(2). And while not going so far as to hold that the statute violates Article I, Section 1; the Court of Appeals did hold that Article I, Section 1, provides "(tlhe citizens of *978 Indiana ... a fundamental right of privacy" that includes "protection of the right to make ... the decision to terminate pregnancy." Clinic for Women, 814 N.E.2d at 1048-49. The Court of Appeals then remanded this case to the trial court for an evidentiary hearing on whether the statute imposes "a material burden" on this right. Id. at 1050-52. Having previously granted the State's petition to transfer, we now affirm the judgment of the trial court.
Discussion
As the Court of Appeals acknowledged, its decision finding a "fundamental right of privacy inherent in and protected by our state constitution" has "never been explicitly stated." Clinic for Women, 814 N.E.2d at 1048. The State argues to us that the fact that no such constitutional right had been stated before should have caused the Court of Appeals to infer that no such constitutional right exists. Pet. to Transfer at 5-6. The State further contends that Article I, Section 1, protects no judicially enforceable rights in general and does not protect a right to abortion in particular. Id. at 3-4. We find it unnecessary to determine whether there is any right to privacy or abortion provided or protected by Indiana's Constitution because we are of the view that (a) plaintiffs in this case have not overcome the heavy burden imposed on those challenging the facial validity of a statute, and (b) in any event, the provisions of the statute are such that they would not impermissibly impinge upon any right to privacy or right to abortion that might exist.
I.
Both the State and the plaintiffs focus on whether Indiana Code § 16-34-2-1.1 places a "material burden" on a woman's right to make the ultimate decision to terminate her pregnancy. This standard was first articulated in Price v. State, 622 N.E.2d 954 (Ind.1993), where the defendant was convicted of disorderly conduct based on her statements to an arresting officer. Although defendant Price challenged the disorderly conduct statute on grounds that it was overbroad and therefore void "on its face," id. at 958, this Court rejected that claim declaring among other things, "[ujnless the court concludes that the statute before it is incapable of constitutional application, it should limit itself to vindicating the rights of the party before it." Id. We therefore declined to address the defendant's claim that the challenged statute was unconstitutional on its face and "turn[ed] instead to whether its application in this case was constitutional." Id. (emphasis added). On this "unconstitutional as applied" claim, we announced the "material burden" standard. It provides in relevant part: "[The State may not punish expression when doing so would impose a material burden upon a core constitutional value." Id. at 960. We elaborated:
Rationality inquiry ... has historically centered on whether the impingement created by the statute is outweighed by the public health, welfare, and safety served. "Material burden" analysis involves no such weighing nor is it influenced by the social utility of the state action at issue. Instead, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired.
Id. at 960-61 n. 7 (citations omitted).
With one exception, our courts have been faced with the Price "material burden" standard only in the context that certain state action is unconstitutional as applied in a given case.[6] Most cases in *979 volved claims that a disorderly conduct conviction or juvenile adjudication materially burdened a right of free speech. See Whittington v. State, 669 N.E.2d 1363 (Ind.1996); Matter of U.M. v. State, 827 N.E.2d 1190 (Ind.Ct.App.2005); Mitchell v. State, 813 N.E.2d 422 (Ind.Ct.App.2004), trans. denied; Madden v. State, 786 N.E.2d 1152 (Ind.Ct.App.2003), trans. denied, 792 N.E.2d 48; Johnson v. State, 747 N.E.2d 623 (Ind.Ct.App.2001); Shoultz v. State, 735 N.E.2d 818 (Ind.Ct.App.2000), trans. denied, 753 N.E.2d 2; Johnson v. State, 719 N.E.2d 445 (Ind.Ct.App.1999); Radford v. State, 640 N.E.2d 90 (Ind.Ct.App.1994), trans. denied. Two involved freedom of religion claims; see City Chapel Evangelical Free, Inc. v. City of South Bend, 744 N.E.2d 448 (Ind.2001) (church claimed city's taking of church property materially burdened right to religious exercise); Endres v. Indiana State Police, 794 N.E.2d 1089 (Ind.Ct.App.2003) (police officer discharged from job for failure to work at casino claimed his right to religious freedom was materially burdened), affirmed in part, vacated in part, 809 N.E.2d 320 (Ind.2004); and another apparently involved a claim of freedom of the press. In re WTHR-TV, 698 N.E.2d 1 (Ind.1998) (defendant news stations claimed trial court order compelling disclosure of outtakes without a special showing of need and relevance materially burdened their rights to free speech).
In this case there has been no claim that Indiana Code § 16-84-2-1.1 is unconstitutional as applied to any particular plaintiff. And indeed because of this case's procedural posture, no such claim could be made. Seeking declaratory and injunctive relief, plaintiffs originally filed their complaint in the Federal District Court for the Southern District of Indiana. At the time, the statute at issue had been enacted but had not yet taken effect. The district court granted relief in part and enjoined the operation of the statute. Because plaintiffs sought a pre-enforcement injunetion, their constitutional challenge to the statute was by necessity a facial one. We observed as much when responding to certified questions from the district court. Ree A Woman's Choice-East Side Women's Clinic v. Newman, 671 N.E.2d 104, 106 (Ind.1996) (noting that the court had certified certain questions to us "so that we may resolve a facial challenge to the abortion law's constitutionality."). The case is now before us in exactly the same posture. The only substantive difference is that rather than a facial challenge to the statute under the federal Constitution, plaintiffs now make a facial challenge to the statute under the Indiana Constitution.[7]
The federal cireuit courts are in disagreement on the standard governing facial challenges to statutes under the federal Constitution. Before. Casey, the standard set forth in United States v. Salerno, controlled:
A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of cireum-stances exists under which the Act would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of cireum- *980 stances is insufficient to render it wholly invalid .... «
481 U.S. 789, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (involving a constitutional challenge to the Bail Reform Act of 1984). In Casey, the Supreme Court did not mention or cite Salerno, but rather announced a new standard: "undue burden." Under this standard a legislative enactment violates the federal Constitution if "in a large fraction of the cases in which [the statute at issue] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Casey, 505 U.S. at 895, 112 S.Ct. 2791. If the "undue burden" standard applies, then a facial challenge no longer needs to demonstrate that application of the statute results in a constitutional violation every time, only that application of the statute results in a constitutional violation "in a large fraction of the cases" in which the statute is relevant. Some federal cireuit courts have determined the Salerno test continues to apply in the context of facial challenges to abortion statutes.[8] Other circuits have determined that the "undue burden" standard applies.[9]
Whether the Salerno standard for facial challenges survives Casey for purposes of federal constitutional law is of no moment in this case. Regardless of the standard applicable to legislative enactments challenged under the federal Constitution, this jurisdiction applies the Salerno standard to facial challenges under the Indiana Constitution. More specifically we have determined: ~
When a party claims that a statute is unconstitutional on its face, the claimant assumes the burden of demonstrating that there are no set of circumstances under which the statute can be constitutionally applied. Although we have never explicitly said that this principle applies to state constitutional analysis as well as federal, we have suggested as much. We now so hold.
Baldwin v. Reagan, 715 N.E.2d 332, 337 (Ind.1999) (citations omitted) (rejecting plaintiffs' contention that the Seatbelt Enforcement Act is unconstitutional on its face). This is a heavy burden, which the plaintiffs here have not met.
Challenging the plaintiffs' complaint, the defendants filed a motion to dismiss under Indiana Trial Rule 12(B)(6) alleging the complaint failed to state a claim under which relief can be granted. When reviewing a motion to dismiss for failure to state a claim, this Court accepts as true the facts alleged in the complaint. City of New Haven v. Reichhart, 748 N.E.2d 374, 377 (Ind.2001). We view the pleadings in the light most favorable to the non-moving party, and draw every reason *981 able inference in favor of that party. Id. We will affirm a successful TR. 12(B)(6) motion when a complaint states a set of facts, which, even if true, would not support the relief requested in that complaint. Id. at 377-78.
In this case, even if taken as true, the material allegations contained in the plaintiffs' complaint do not support their claim that Indiana Code § 16-34-2-1.1 is invalid on its face. The complaint alleges in pertinent part:
Although abortion is safer than childbirth, the health risks associated with abortion increase significantly with delay. The longer women delay in obtaining abortion services, the greater the cost of the care.... The challenged statute will compel many women seeking abortions to delay in obtaining an abortion; to travel to a neighboring state to obtain an abortion; to carry pregnancies to term; and to pursue alternatives to legal abortion to end their pregnancies. Each of these alternatives will cause foreseeable psychological and physical harm, as well as economic and other injuries.
Appellants' App. at 14. First, the health concerns outlined in the complaint already have been addressed. The statute itself contains a medical emergency carve-out from the 18-hour waiting period. And responding to a certified question from the federal district court we held, "the statute permits immediate abortion far short of medical calamities, An attending physician may dispense with the statutory informed consent requirements when she concludes in her best clinical judgment that her patient's condition indicates an abortion is medically necessary." A Woman's Choice, 671 N.E.2d at 110.
This leaves, then, the increased cost of care that will be occasioned by the 18-hour delay and that many women may (i) delay obtaining abortions, (ii) travel to other states to obtain abortions, (ii) carry pregnancies to term, or (iv) seek alternatives to legal abortions. Setting aside the fact that "many" is not readily quantifiable, the fact that some unknown number of women may be adversely affected by the delay obviously means that not all or perhaps not even most will be so affected.
As for the increased cost of care, even assuming all women on whom the 18-hour waiting period is imposed will face econom-ie hardship, "a law or ordinance does not violate the Constitution solely because it directly or indirectly results in economic hardship ...." Martin v. Stites, 203 F.Supp.2d 1237, 1251 (D.Kan.2002) (rejecting claim that economic hardship arising out of method by which towing contracts were awarded deprived plaintiff of protected liberty interest). See also Webster v. Reproductive Health Services, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (Court upheld constitutionality of statute requiring fetal viability testing, despite the fact that tests would increase costs of abortion by several hundred dollars).
Again, it is important to emphasize that in this facial challenge to the constitutionality of Indiana Code § 16-34-2-1.1, plaintiffs carry the burden of demonstrating that "there are no set of cireumstances under which the statute can be constitutionally applied." Baldwin, 715 N.E.2d at 337 (emphasis added). The allegations in plaintiffs' complaint simply fail to meet this high standard. To the contrary, there certainly are circumstances under which Indiana Code § 16-34-2-1.1 can be constitutionally applied. Accordingly plaintiffs' facial challenge must fail. The trial court correctly granted defendants' T.R. 12(B)(6) motion to dismiss.
H.
Although we are of the view that the plaintiffs' challenge to the constitution *982 ality of Indiana Code § 16-84-2-1.1 is a facial one, we nevertheless proceed to analyze whether, if presented with a challenge to the statute as applied, there could be an issue for trial as Justice Boehm contends and the Court of Appeals held. We hold that there could not be because Indiana Code § 16-84-2-1.1 does not impose a material burden upon any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1.
If presented with a claim that a legislative enactment or other state regulation as applied infringes upon a constitutional right, the degree of the alleged infringement will be assessed to determine whether it is constitutional. This assessment must be made using the appropriate standard of review. We first address the appropriate standard for reviewing whether the statute here violates any right to privacy or right to abortion provided or protected by Article I, Section 1.
A.
As a matter of federal constitutional law, Casey announced that the proper standard of review for the constitutionality of restrictions on the abortion right before viability would henceforth be whether "state regulation imposes an undue burden on a woman's ability to make" the decision to terminate her pregnancy. Casey, 505 U.S. at 874, 112 S.Ct. 2791.
The Supreme Court explained the undue burden standard as follows:
A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends....
Some guiding principles should emerge. What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose. Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal.
Id. at 877-78, 112 S.Ct. 2791 (citations omitted)..
B.
The standard of review applicable to federal constitutional review does not control state constitutional review.[10] As a matter of state constitutional law, Indiana courts have used a number of different standards of review, depending upon the particular constitutional right alleged to be infringed and the magnitude of it. The most exacting of these standards has been that established in Price, 622 N.E.2d at 959 n. 4, where we famously declared *983 that a legislative enactment or government regulation would be unconstitutional if it imposed a "material burden" on a "fundamental right" that constituted a "core constitutional value." The "core constitutional value" implicated in Price was the freedom of political expression protected by Article I, Section 9, of the Indiana Constitution. In Price, we found that a woman's noisy protest about police conduct constituted constitutionally protected political speech and reversed her conviction for disorderly conduct. "Subjecting the political expression of Hoogiers to this standard of gentility [polite criticism] would impose a material burden." Id. at 968.[11]
In this case, as already stated, the Court of Appeals concluded that Article I, Section 1, contains a fundamental right of privacy, rising to the level of a "core constitutional value," that includes "protection of the right to make ... the decision to terminate pregnancy." Clinic for Women, 814 N.E.2d at 1049. That being the case, the Court of Appeals said the statute would be unconstitutional if it imposed a "material burden" on that right, invoking the Price "material burden" test. Id. (citing Price, 622 N.E.2d at 960).
In order to set to one side the question of whether the Indiana Constitution embodies a core constitutional value of privacy that includes a right to abortion, we assume the applicability of the Price "material burden" standard where the petitioners bring an as applied constitutional challenge to a statute.
Price declared that "[al right is impermissibly alienated when the State materially burdens one of the core values which it embodies." Id. at 960. "Material burden" analysis does not involve weighing nor is it influenced by the social utility of the state action at issue. City Chapel Evangelical Free, Inc., 744 N.E.2d at 447 (citing Price, 622 N.E.2d at 960 n. 7). As enunciated in Price, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired. Id. The Court in Whittington v. State elaborated on these points: "[Sltate action does not impose a material burden on expression if either the 'magnitude of the impairment' is slight, or the expression threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." 669 N.E.2d at 1370 (citations to Price omitted).[12]
C.
We find the operation and effect of the "material burden" standard of Price and "undue burden" standard of Casey to be *984 virtually indistinguishable for purposes of this analysis. Both tests. avoid weighing the relative interests of the constitutional right and of the state regulation at issue in the case. Instead, they measure the extent to which the state regulation impinges upon the central principle that the constitution protects. - '
In Casey, that central principle-"[what is at stake"-is "the woman's right to make the ultimate decision" to terminate her pregnancy. A regulation would be unconstitutional, i.e., it would impose an undue burden, if it had "the effect of placing a substantial obstacle in the path of a woman's choice." This is so even if the regulation "further[s] the interest in potential life or some other valid state interest." Casey, 505 U.S. at 877, 112 S.Ct. 2791.
Under Price, the central principle is "the purpose for which [the core constitutional value] was designed." It seems apparent that if there is a core constitutional value of privacy implicated here, the purpose for which it is designed is a woman's right to make the ultimate decision to terminate her pregnancy-the same central principle at stake in Casey. A regulation would be unconstitutional, ie., it would impose a material burden, if it has the effect of "the right, as impaired, ... no longer serving] the purpose for which it was designed," Price, 622 N.E.2d at 961 n. 7; in this case, no longer permitting a woman to make the ultimate decision to terminate her pregnancy.
Price's more abstract language can be read to give the State somewhat more regulatory leeway than does Casey. Price ean be read to say that a state regulation would constitute a material burden only if it totally blocked the path of a woman's choice-if it made it so that the right no longer served the purpose for which. it was designed-whereas a regulation could fail Casey's undue burden test short of total blockage merely by placing a substantial obstacle in that path. We think this reading would incorrectly lessen Price's mandate. It is true, as Price says, that the material burden test is failed if a state regulation totally blocks the purpose for which the constitutional right was designed. But Price does not foreclose a lesser impairment also constituting a material burden. We believe and hold that a state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed; and we hold that in most cireumstances, less than a substantial obstacle does not.
More broadly, we hold that Price's material burden test is the equivalent of Casey's undue burden test, at least for purposes of assessing whether a state regulation violates any fundamental right of privacy that may include protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1, of the Indiana Constitution.
HIL.
As previously noted, material burden review has only been applied to claims regarding the freedom of political expression protected by Article I, Section 9, of the Indiana Constitution. The cases in which those claims arose are of little assistance in analyzing whether the statute at issue here would constitute a material burden to any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1. But we do have the benefit of the decisions of a number of other courts assessing whether the same or similar statutes constituted undue burdens upon a woman's constitutional right to terminate her pregnancy.
*985 First and foremost among them is Casey. In that case, the federal district court had found the Pennsylvania 24-hour waiting period requirement to be unconstitutional. Justices O'Connor, Kennedy, and Souter delivered a joint opinion that has come to be viewed as "the Supreme Court's dominant view." See Roger B. Dworkin, Limits 48 (1996). In it, the Justices concluded that "the essential holding of Roe v. Wade should be retained ...." Casey, 505 U.S. at 846, 112 S.Ct. 2791. It then announced, as noted above, that the proper standard for review is "undue burden," id. at 874, 112 S.Ct. 2791, that is, whether a provision of law's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id. at 877, 112 S.Ct. 2791.
When the Justices turned their attention to the waiting period requirement, they found that, "in theory," it was "a reasonable measure to implement the State's interest in protecting the life of the unborn, a measure that does not amount to an undue burden." Id. at 885, 112 S.Ct. 2791. The Justices then considered whether the waiting period requirement was "nonetheless invalid because in practice it [was] a substantial obstacle to a woman's choice to terminate her pregnancy." They deemed this to be "a closer question," in part because "the practical effect" of the waiting period meant that "a woman seeking an abortion [must] make at least two visits to the doctor." While the Justices found to be troubling the findings of the district court that the waiting period requirement would be "particularly burdensome," they held that the requirement did "not demonstrate that the waiting period constitute[d] an undue burden." Rather, they said:
[UJnder the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest. And while the waiting period does limit a physician's discretion, that is not, standing alone, a reason to invalidate it. In light of the construction given the statute's definition of medical emergency ...,[13] we cannot say that the waiting period imposes a real health risk.
We also disagree with the District Court's conclusion that the "particularly burdensome" effects of the waiting period on some women require its invalidation. A particular burden is not of necessity a substantial obstacle. Whether a burden falls on a particular group is a distinct inquiry from whether it is a substantial obstacle even as to the women in that group. And the District Court did not conclude that the waiting period is such an obstacle even for the women who are most burdened by it. Hence, on the record before us, and in the context of this facial challenge,[14] we are not convinced that the 24-hour waiting period constitutes an undue burden.
Id. at 886-87, 112 S.Ct. 2791.
To repeat, as a declaration of federal constitutional law, Casey does not in any way direct our determination of state constitutional law on this point. But both Casey and the case before us contend that virtually identical state regulations violate women's rights to terminate their pregnancies; Casey found that the regulation was not an undue burden on those rights; *986 if such rights exist under the Indiana Constitution, the regulation would violate them only if it imposed a material burden on them; and as we have held earlier in this opinion, undue burden and material burden are the equivalent of one another.
When the Indiana statute at issue in this case was reviewed by the United States Court of Appeals for the Seventh Circuit, the court (like the Supreme Court in Casey itself) was in the procedural posture of reviewing a District Court judgment that had found, after trial, that the evidence presented by the plaintiffs demonstrated that the two trip requirement imposed an undue burden. The Court of Appeals reversed, concluding that the evidence the District Court found persuasive was not of the character to justify "depart[ure] from the holding of Casey that an informed-consent law is valid even when compliance entails two visits to the medical provider." A Woman's Choice, 305 F.3d at 692. The court's reason for reversing was essentially that, while the District Court had relied upon studies showing that the number of abortions in Mississippi and Utah had decreased after the adoption of similar waiting period statutes, those studies did not prove what would happen in Indiana if the waiting period requirement took effect here. Id. at 692. (At the time of the Seventh Circuit's decision, the waiting period requirement had never taken effect because of the District Court's injunction.)
Of value to our analysis here are two other points made by the Seventh Circuit. First, it pointed to the language in Casey quoted above that held that Pennsylvania's waiting period requirement did not impose an undue burden, even assuming that the District Court in Casey had been correct in finding the waiting period requirement to be "particularly burdensome." Id. at 691-92. Second, the Seventh Cireuit took the position that, although it acknowledged that it did not have Supreme Court authority for this position and so rested its holding on alternative grounds, in order to assure a nationally uniform approach to enforcing the undue burden standard, "constitutionality must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges." Id. at 688. These two points together form a strong argument that we should assess the constitutionality of the statute based on the language of the statute itself and not on the outcome of the evidentiary hearing ordered by the Indiana Court of Appeals.
Shortly after Casey was decided, a challenge to a similar 24-hour waiting period statute came before the Ohio Court of Appeals. That court concluded that, as a matter of state constitutional analysis, the undue burden test was appropriate. Finding that the challenged Ohio statute was indistinguishable from the Pennsylvania enactment at issue in Casey, it held that there was no basis for concluding that the relevant provisions of the "Ohio Constitution impose[d] greater restrictions upon the state than [were] imposed by the United States Constitution as construed by the plurality opinion in [Casey ]." Preterm Cleveland v. Voinovich, 89 Ohio App.3d 684, 627 N.E.2d 570, 578 (1993). The Ohio court went on to say:
In this case, we are guided by [Casey ], which does establish the standards under the United States Constitution. Although the state is free to apply its own constitution differently from the way the United States Supreme Court determines the federal constitution should be applied, we find no reason under the cireumstances of this case to find that the Ohio Constitution confers upon a pregnant woman a greater right to choose whether to have an abortion or bear the child than is conferred by the United States Constitution, as explained in the plurality opinion of [Casey l. *987 Stated conversely, we see no reason for finding that the Ohio Constitution places greater restrictions upon state action than are placed by the United States Constitution as construed in the plurality opinion of [Casey ].
Id. at 584.
More recently, the Mississippi Supreme Court decided a similar case. Under the Mississippi Constitution, there is a state constitutional right to privacy that includes "an implied right to choose whether or not to have an abortion." Pro-Choice Miss. v. Fordice, 716 So.2d 645, 654 (Miss.1998). To analyze a claim that a 24-hour waiting period requirement violated that constitutional right, the court adopted Casey's reasoning that "'the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty.... A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." ' Id. at 655 (quoting Casey, 505 U.S. at 876-77, 112 S.Ct. 2791). In adopting this reasoning, the Mississippi court said:
While we have previously analyzed cases involving the state constitutional right to privacy under a strict serutiny standard requiring the State to prove a compelling interest, we are not bound to apply that standard in all privacy cases. The abortion issue is much more complex than most cases involving privacy rights. We are placed in the precarious position of both protecting a woman's right to terminate her pregnancy before viability and protecting unborn life. In an attempt to create a workable framework out of these diametrically opposed positions, we adopt the wellreasoned [sic] decision in Casey, applying the undue burden standard to analyze laws restricting abortion. We do not limit any future application of the strict serutiny standard for evaluating infringement on a person's right to privacy in other areas.
Fordice, 716 So.2d at 655. The court went on to conclude that the 24-hour waiting requirement did not create an undue burden, in part because it ensured that "a woman has given thoughtful consideration in deciding whether to obtain an abortion." [15]
IV.
We held that Price's material burden test is the equivalent of Casey's undue *988 burden test, at least for purposes of assessing whether a state regulation violates any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1. The analyses of the Supreme Court in Casey and of the Seventh Circuit and the courts in Ohio and Mississippi persuade us that the Indiana statute does not impose a substantial obstacle to a woman's ability to terminate her pregnancy, regardless of any right she may have to do so that is protected by Article I, Section 1. After reviewing the cases discussed above, we hold that Indiana Code § 16-84-2-1.1 would not impose a material burden upon any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section 1, and is, therefore, constitutional.
Conclusion
Having previously granted transfer, thereby vacating the opinion of the Court of Appeals, App. R. 58(A), we now affirm the judgment of the trial court.
SHEPARD, C.J., and SULLIVAN, J., concur.
DICKSON, J., concurs in result with separate opinion.
BOEHM, J., dissents with separate opinion.

. Indiana Code Section 16-34-2-1.1(a) provides:
An abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:
(1) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice nurse (as defined in IC 25-23-1-1(b)), or a midwife (as defined in IC 34-18-2-19) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has orally informed the pregnant woman of the following:
(A) The name of the physician performing the abortion.
(B) The nature of the proposed procedure or treatment.
(C) The risks of and alternatives to the procedure or treatment.
(D) The probable gestational age of the fetus, including an offer to provide:
(i) a picture or drawing of a fetus;
(ii) the dimensions of a fetus; and
(iii) relevant information on the potential survival of an unborn fetus;
at this stage of development.
(E) The medical risks associated with carrying the fetus to term.
(F) The availability of fetal ultrasound imaging and auscultation of fetal heart tone services to enable the pregnant woman to view the image and hear the heartbeat of the fetus and how to obtain access to these services.
(2) At least eighteen (18) hours before the abortion, the pregnant woman will be orally informed of the following:
(A) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care from the county office of family and children.
(B) That the father of the unborn fetus is legally required to assist in the support of the child. In the case of rape, the information required under this clause may be omitted.
(C) That adoption alternatives are available and that adoptive parents may legally pay the costs of prenatal care, childbirth, and neonatal care.
(3) The pregnant woman certifies in writing, before the abortion is performed, that the information required by subdivisions (1) and (2) has been provided.

. Article I, Section 1, provides:
WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government.

. Article I, Section 12, provides, "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

. Article I, Section 9, provides, "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible."

: In the trial court, the plaintiffs also maintained that the statute violates Article I, Section 23, in several respects because it "is not reasonably related to inherent, characteristics which distinguish a class of women making the medical decision to have an abortion from the class of all persons making other medical decisions"; "is not reasonably related to inherent characteristics which distinguish women seeking medical services from men seeking medical services"; "infringes upon the fundamental right of plaintiffs' patients to choose whether or not to continue a pregnancy; and "impermissibly discriminates on the basis of sex." Plaintiffs do not present these.claims on appeal.

. Morrison v. Sadler, 821 N.E.2d 15 (Ind.Ct. App.2005), trans. not sought (applying materi *979 al burden standard to address plaintiffs' facial challenge to the constitutionality of the Defense of Marriage Act).

. In their brief before the Court of Appeals plaintiffs specifically alleged, '"Ind.Code § 16-34-2-1.1(1) is unconstitutional because it impinges on a woman's right to obtain an abortion which materially burdens a core value protected by Art. I, § 1 of the Indiana Constitution." Appellants' Br. at 9.

. See, e.g., Manning v. Hunt, 119 F.3d 254, 268 n. 4 (4th Cir.1997) (noting that the Salerno test must be applied until the Supreme Court expressly overrules it); Barnes v. Moore, 970 F.2d 12, 14 (5th Cir.1992) (holding the same).

. See, e.g., Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 142-43 (3d Cir.2000) (holding the "undue burden" standard, instead of Salerno test, applies in abortion context after Casey ); Women's Med. Prof. Corp. v. Voinovich, 130 F.3d 187, 193-96 (6th Cir.1997) (holding that Casey effectively overruled Salerno); A Woman's Choice, 305 F.3d at 687 (noting that Supreme Court has yet to overrule Salerno, but in face of newer, conflicting standard, chose newer standard in abortion context); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir.1995) (opting to apply the "undue burden" test); Planned Parenthood of Southern Arizona v. Lawall, 180 F.3d 1022, 1025-27 (9th Cir.1999) (holding that Casey has overruled Salerno in the context of facial challenges to abortion statutes); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996) (observing that Supreme Court applied "undue burden" test in Casey instead of Salerno test).

. Of course, the Supremacy Clause would prevent us from using a standard of review that. would purport to validate a regulation that did not pass federal constitutional muster. f

. We have identified "core constitutional values" in one other case. See City Chapel Evangelical Free, Inc., 744 N.E.2d at 450 (Ind.2001) (holding that Article I, Sections 2 and 3, "advance core values that restrain government interference with the practice of religious worship, both in private and in community with other persons"). In that case, a city sought to acquire a church's property by eminent domain. We concluded that the church was entitled to present its claim to the trial court that the loss of its property would materially burden its rights embodied in the core values. Id. at 450. As such, we did not engage in material burden review ourselves.

. Like Price, Whittington was an appeal of a conviction for disorderly conduct, based on Whittington's loud speaking during a police investigation. Unlike Price, Whittington's conviction was affirmed. The speech in Price was "political," thereby implicating a "core constitutional value" and triggering material burden review. We held the speech in Whit-tington not to be political and, therefore, not subject to material burden review. Whittington, 669 N.E.2d at 1370.

. Indiana has a comparable medical emergency provision. See A Woman's Choice, 305 F.3d at 685-86. Indeed, it may be broader than the Pennsylvania provision. See A Woman's Choice, 671 N.E.2d at 110.

. For present purposes, comparing the "material burden" and "undue burden" standards, we do not believe the fact that Casey involved a facial challenge is material.

. The Tennessee Supreme Court has reached a different result. Like Mississippi, Tennessee recognizes a state constitutional right to privacy that encompasses "a woman's right to obtain a legal termination of her pregnancy ...." Planned Parenthood of Middle Tenn. v. Sundquist, 38 S.W.3d 1, 11 (Tenn.2000). But unlike Mississippi (and the Justices in Casey and the court in Ohio), the Tennessee court found that the abortion right was so similar to constitutionally protected "marriage, child rearing, and other procreational interests," id. at 15, that regulations impinging upon it should be reviewed under a standard of strict scrutiny, not undue burden. Id. In the course of adopting strict scrutiny review, the court sharply criticized the undue burden test as not providing adequate guidance for principled appellate review and invoking Justice Scalia's criticism of it in Casey as being "ultimately standardless." Id. at 16 (quoting Casey, 505 U.S. at 987, 112 S.Ct. 2791 (Scalia, J. dissenting and concurring)).
Applying the strict scrutiny test, the Tennessee court found that the State had failed to carry its burden of showing that Tennessee's two-day waiting period requirement was "narrowly tailored to further its compelling interest in maternal health." Sundquist, 38 S.W.3d at 24. The court went on to conclude that "the two-day waiting period has the effect of placing 'a substantial obstacle in the path of a woman seeking an abortion,' " such that it also failed the undue burden test. Id. (citing Casey, 505 U.S. at 878, 112 S.Ct. 2791).